**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOYOLA UNIVERSITY MEDICAL CENTER,<br>*Plaintiff*,<br>v.<br>XAVIER BECERRA,<br>*Defendant*. | Civil Action No. 20-3160 (TJK) |

**MEMORANDUM OPINION**

Loyola University Medical Center is a teaching hospital that receives Medicare reimbursements for its resident training programs. In 2010, Loyola discovered that it had inadvertently omitted four programs from its reimbursement calculations, which would have entitled it to more payments. Loyola requested that the contractor assigned to reviewing its cost reports add those programs—and therefore, under the relevant regulatory scheme, add several slots to what is called its full-time equivalent resident cap—for those years' cost reports. The contractor declined, and the Provider Reimbursement Review Board affirmed that decision, reasoning that Section 422 of the Medicare Modernization Act and related regulations prohibited review of Loyola's full-time equivalent resident cap for those years. Loyola sued the Secretary of Health and Human Services to challenge that decision as unlawful under the Administrative Procedure Act. The parties moved for summary judgment. For the reasons explained below, the Court agrees with Loyola that the Board's decision was unlawful because it was based on a flawed reading of the statute. Thus, the Court will grant summary judgment for Loyola, vacate the Board's decision, and remand the matter back to the Board for proceedings consistent with this Memorandum Opinion.

# I. Background

## A. Statutory and Regulatory Scheme

Under Subsection (h) of the Medicare Act, 42 U.S.C. § 1395ww(h), the Center for Medicare and Medicaid Services ("CMS") of the Department of Health and Human Services reimburses hospitals prospectively for costs associated with "resident stipends, supervisory physician salaries, and administrative costs."[1] These reimbursements, known as direct graduate medical education ("DGME") payments, are the product of a hospital's "patient load"[2] and its "approved amount." 42 U.S.C. § 1395ww(h)(3)(A). The "approved amount," in turn, is calculated by multiplying the per-resident amount[3] by the weighted average number of full-time equivalent ("FTE") residents employed by the hospital. *Id.* § 1395ww(h)(3)(B). The weighted average number of FTEs—the component relevant here—is the average of "the actual full-time equivalent resident counts for the cost reporting period and the preceding two cost reporting periods." *Id.* § 1395ww(h)(4)(G)(i).

In 1997, Congress decided to limit the weighted average number of FTEs and established the full-time equivalent resident cap ("FTE cap"). With some exceptions not relevant here, a hospital's FTE cap is first set as the weighted average number of full-time equivalent residents reported by the hospital in its most recent cost reporting period before December 1996. 42 U.S.C. § 1395ww(h)(4)(F)(i). If a hospital trains more residents than its FTE cap, it receives no payments for those added residents.

---

[1] Cong. Res. Serv., Federal Support for Graduate Medical Education: An Overview 11 (updated Dec. 27, 2018), https://fas.org/sgp/crs/misc/R44376.pdf.

[2] Patient load is the fraction of inpatient-bed-days attributable to Medicare patients. 42 U.S.C. § 1395ww(h)(3)(C).

[3] The per-resident amount is the hospital's cost of treating patients in 1984, updated for inflation. 42 U.S.C. § 1395ww(h)(2).

The FTE cap is an annual calculation made to determine a hospital's DGME payments; it is a calculation the Secretary must make anew "for each cost reporting period." 42 U.S.C. § 1395ww(h)(2). And although the FTE cap was generally set as described above, the statute allows a hospital's FTE cap to be modified if it establishes new training programs not included in its most recent cost report for the period before December 1996. Thus, Congress authorized the Secretary to "prescribe rules" for how to deal with "medical residency training programs established on or after January 1, 1995." 42 U.S.C. § 1395ww(h)(4)(H)(i)(I). Under the promulgated rules, a hospital's FTE cap "may be adjusted for a new medical residency training program," if that new training program is accredited by an appropriate accrediting body. 42 C.F.R. § 413.79(e)(2). For most hospitals, this general rule permitting its FTE cap to increase for new programs only applies if the new program was established between January 1995 and August 1997. *Id*. But rural hospitals may raise their FTE caps with new programs established even after August 1997. *Id.* § 413.79(e)(3). The regulations also provide a formula for determining the adjustment value of a qualifying new program on a hospital's FTE cap.[4]

Several years later, in 2003, Congress passed Section 422 of the Medicare Modernization Act, which mandated a one-time redistribution of hospitals' FTE caps.[5] ECF No. 14-1 at 21. This redistribution was intended to optimize hospitals' usage of available training slots by reducing the FTE caps of those training fewer residents than their caps permitted and redistributing those slots to other hospitals. *Id.* To determine whether a hospital would lose slots, Section 422 required the

[4] The adjustment "is based on the sum of the product of the highest number of FTE residents in any program year during the third year of the newly established program and the number of years in which residents are expected to complete each program based on the minimum accredited length for the type of program." 42 C.F.R. § 413.79(e)(2).

[5] Pub. L. No. 108-173, § 422, 117 Stat. 2066, 2284 (codified at 42 U.S.C. § 1395ww(h)(7)).

Secretary to compare a hospital's "reference resident level" to its "otherwise applicable resident limit." 42 U.S.C. § 1395ww(h)(7)(A)(i)(I). The "reference resident level" is the number of full-time residents a hospital trained in its most recent cost report on or before September 2002.[6] *Id.* § 1395ww(h)(7)(A)(ii). The "otherwise applicable resident limit" is the hospital's FTE cap for that same period. *Id.* § 1395ww(h)(7)(C)(ii). If a hospital's "reference resident level" was lower than its "otherwise applicable resident limit"—in other words, if that hospital trained fewer residents than its FTE cap allowed in that cost-reporting period—Section 422 would impose a permanent reduction in that hospital's FTE cap. *Id.* § 1395ww(h)(7)(A)(i)(I).[7] These additional cap slots were then available for redistribution to qualifying hospitals in accordance with certain criteria laid out in the statute. *Id.* § 1395ww(h)(7)(B). Importantly for the dispute here, Section 422 commands that "[t]here shall be no administrative or judicial review . . . with respect to determinations made under this paragraph." 42 U.S.C. § 1395ww(h)(7)(E).

Section 422's implementing regulations largely track the statutory definition of "reference resident level," explaining that the "reference resident level" is the most recent cost report on or before September 2002. 42 C.F.R. § 413.79(c)(3)(ii)(A)(1). The regulations define the "otherwise applicable resident limit" as the "FTE resident cap as determined under paragraph (c)(2) of this section or paragraph (e) of this section." *Id.* § 413.79(c)(3). Paragraph (c)(2), in turn, explains that the FTE cap is generally set as the 1996 cost report limit, while paragraph (e) provides that

---

[6] The statute also allows for an alternative "reference resident level." A hospital may request that the Secretary use a reporting period up to July 2003, rather than September 2022, to account for "an expansion of an existing residency training program that is not reflected on the most recent settled cost report." 42 U.S.C. § 1395ww(h)(7)(A)(ii)(II).

[7] More specifically, such a hospital's FTE cap would be reduced by 75% of the difference between its FTE cap and the number of residents it trained. *Id.* For example, if a hospital's FTE cap in the relevant cost reporting period was 20 but it trained only 10 residents that year, the hospital's FTE cap would be reduced by 7.5—75% of 10—to 12.5.

the 1996 limit, which otherwise serves as the cap under (c)(2), may be adjusted for newly created programs. In summary, under the regulations, to determine a hospital's Section 422 reduction, the Secretary must determine the hospital's "otherwise applicable resident limit," and to do that, he must use the FTE cap for its most recent cost report on or before September 2002 as explained in paragraph (c)(2) of the regulations, including the effects of any new programs under paragraph (e) of the regulations.

To receive DGME payments, a hospital must submit a cost report to its designated Medicare Administrative Contractor ("MAC"). 42 C.F.R. § 413.24(f). MACs are private entities that have been delegated authority by the Secretary to perform auditing functions. 42 U.S.C. § 1395kk–1. The Secretary provides MACs with forms and instructions through the Provider Reimbursement Manual, which they use to calculate the appropriate payments and reimbursements. Once a designated MAC determines the appropriate reimbursement, it informs the hospital through a Notice of Program Reimbursement. 42 C.F.R. § 405.1803(a). If the hospital is dissatisfied with the MAC's calculation, it may petition the MAC to "reopen" any cost report within the last three years to review "specific findings on matters at issue." *Id.* § 405.1885(a), (c). If the hospital is still dissatisfied, it may appeal the MAC's decision to the Provider Reimbursement Review Board so long as the amount in controversy is at least $10,000 and the hospital requests a Board hearing within 180 days of receiving the MAC's final determination. 42 U.S.C. § 1395oo(a). The Board's decision is final unless the Secretary, or by delegation, the CMS Administrator, reverses, affirms, or modifies that decision. *Id.* § 1395oo(f)(1). Finally, a hospital may ordinarily seek judicial review of the Board's or the Secretary's decision by filing a civil action within 60 days of the date it receives notice of the final decision. *Id.* § 1395oo(f)(1); 42 C.F.R. § 405.1877.

**B. Factual Background**

Loyola University Medical Center is a teaching hospital in Maywood, Illinois. Loyola

operates graduate medical education programs for residents and is eligible to receive Medicare reimbursements for those programs. ECF No. 14-1 at 30. Loyola trained residents in 1996, so its FTE cap is based on the number of residents it trained in that fiscal year. *Id.* at 30–31. Between January 1995 and August 1997, Loyola established four new medical residency training programs. *Id*. at 31. Those programs were all appropriately accredited and otherwise qualify under the Secretary's promulgated regulations, so they would add 6.17 slots to Loyola's 1996 FTE cap. *Id*. at 32. But because of an oversight, Loyola did not discover the eligibility of these programs until 2010, so they were not included in any of Loyola's cost reports before then. *Id.* at 33.

In 2005, Loyola was subject to the one-time slot redistributions under Section 422. ECF No. 14-1 at 32. But because Loyola did not discover the additional 6.17 slots until 2010, they were not included in Loyola's fiscal year 2002 cost report that the Secretary used to determine its Section 422 reduction. *Id.* Still, even using this lower 1996 FTE cap, the Secretary found that Loyola's FTE cap was higher than the number of residents it had trained in 2002, and reduced Loyola's FTE cap by 75% of that difference, as Section 422 requires. *Id.* As a result, Loyola received a permanent 7.84 slot reduction to its FTE cap. *Id.* Had the 6.17 slots been included in the calculation, then Loyola's FTE cap would have been even higher, and its resulting Section 422 reduction would have been greater.

In 2010, Loyola discovered this omission and sought to add the additional 6.17 slots to its FTE cap for the 2004–2007 fiscal year cost reports. ECF No. 14-1 at 33. Those years fell within the three-year reopening period and were therefore subject to revision; earlier reports could no longer be altered. *Id.* By this time, Loyola was training more residents than its FTE cap, so a 6.17 increase in its FTE cap would lead to an increase in DGME payments. *Id.* After reopening Loyola's cost reports for fiscal years 2004 and 2005, the MAC issued Revised Notices of Program

Reimbursement for both years, increasing Loyola's FTE cap by 6.17 slots and awarding it more DGME payments. *Id.*[8] However, the MAC did not award any additional payments for fiscal years 2006 and 2007, after Loyola's FTE cap had been reduced by Section 422, even though it concluded that Loyola had properly established these new programs. *Id.* at 34. Thus, Loyola did not receive any more DGME payments for these new programs for those fiscal years. *Id.*

Loyola appealed the MAC's 2006 and 2007 Revised Notices of Program Reimbursement to the Board, arguing that the MAC incorrectly excluded the 6.17 slots from its FTE cap, and so it miscalculated Loyola's appropriate DGME payments. ECF No. 14-1 at 35. The Board disagreed. ECF No. 22 at 18. The Board reasoned that Loyola's FTE cap was a "determination" made by the Secretary under Section 422 that was not subject to review. *Id*. at 16. And because the Secretary had used Loyola's 2002 cost report in determining its Section 422 reduction, and the FTE cap recorded on the 2002 cost report was the 1996 FTE cap, that 1996 FTE cap value became Loyola's permanent FTE cap. *Id.* The Board concluded that it could not lawfully revise Loyola's cap for 2006 and 2007 to include the additional 6.17 slots. *Id.*

## II. Legal Standard

The Court reviews the Board's decision in accordance with the standard in the Administrative Procedure Act. *See* 42 U.S.C. § 1395oo(f)(1); *E. Texas Med. Ctr.-Athens v. Azar*, 337 F. Supp. 3d 1, 11 (D.D.C. 2018). Thus, although both parties move for summary judgment, the ordinary summary-judgment standard does not apply. Instead, when a plaintiff "seeks review of agency action under the APA," the Court "sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). That is, the Court has no factfinding role

[8] The MAC later represented to the Provider Reimbursement Review Board that it "reopened and settled these cost reports in error." ECF No. 22 at 12. Regardless, those reports are not part of this case.

because the case presents "a question of law." *See id.* It must ask "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013). On top of its purely procedural requirements, the APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious . . . or otherwise not in accordance with law," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Although this review is "fundamentally deferential," it still "requires that an agency's decreed result be within the scope of its lawful authority and that the process by which it reaches that result . . . be logical and rational." *Gentiva Health Servs., Inc. v. Cochran*, 523 F. Supp. 3d 81, 91 (D.D.C. 2021) (internal citations omitted).

## III. Analysis

The Board's decision that additional slots could not be added to Loyola's FTE caps for 2006 and 2007 for purposes of its DGME payments was based on its conclusion that Loyola's FTE caps for those years were "determinations" under Section 422. Thus, the Board held, they were not subject to administrative or judicial review, and so could not be changed. 42 U.S.C. § 1395ww(h)(7)(E). That interpretation of the statute is flawed, and so the Board's decision based on it is unlawful and must be set aside.

### A. The Board's Decision is Not Entitled to *Chevron* Deference

The parties devote much ink to debating whether the Board's interpretation of Section 422 is entitled to *Chevron* deference. If an "agency action is based on the agency's interpretation of a statute it administers," the Court's review is subject to the *Chevron* doctrine. *Porzecanski v. Azar*,

316 F. Supp. 3d 11, 18 (D.D.C. 2018).[9] An interpretation of the Medicare statute is no exception. *Id.*; *see also E. Texas Med. Ctr.-Athens*, 337 F. Supp. 3d 1 at 12. Loyola argues that such deference is inapplicable here for three reasons: (1) The relevant provision involves judicial review and *Chevron* does not apply to such provisions; (2) the Supreme Court's decision in *Azar v. Allina Health Servs*., 139 S. Ct. 1804 (2019), precludes deference to Board adjudications because Congress did not vest the Board with authority to issue rules carrying the force of law; and (3) Section 422 is unambiguous. The Court agrees with the first argument, so it need not address the others.[10]

Despite *Chevron*'s broad applicability, "not every kind of agency interpretation, even of a statute the agency administers, warrants *Chevron* deference." *Miller v. Clinton*, 687 F.3d 1332, 1340 (D.C. Cir. 2012) (citing *United States v. Mead Corp.*, 533 U.S. 218, 227–31 (2001)). As the Supreme Court has explained, "*Chevron* deference 'is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.'" *Smith v. Berryhill*, 139 S. Ct. 1765, 1778 (2019) (quoting *King v. Burwell*, 576 U.S. 473, 485 (2015)). But that premise only holds so long as it is reasonable to believe that Congress would have implicitly delegated the relevant interpretive authority to the agency. That is not so for provisions precluding judicial review because "[t]he scope of judicial review [] is hardly the kind of question that the Court presumes that Congress implicitly delegated to an agency." *Id; see also*

---

[9] The Supreme Court recently heard argument on whether *Chevron* should be overruled or clarified. *See Loper Bright Enterprises v. Raimondo*, No. 22-451, (arg. Jan. 17, 2024); *Relentless, Inc. v. Dep't of Com.*, 22-1219 (arg. Jan. 17, 2024). But because the Board is not entitled to *Chevron* deference, that decision will have no effect here.

[10] Even if the Court were to apply *Chevron*, under step two of that framework it only defers to a "permissible agency interpretation of the statute." *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000). For the reasons explained below, the Court is skeptical that the Board's interpretation of what constitutes a "determination" under Section 422 is a permissible agency interpretation.

*Fox Television Stations, Inc. v. F.C.C.*, 280 F.3d 1027, 1038–39 (D.C. Cir. 2002), *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) ("Nor is an agency's interpretation of a statutory provision defining the jurisdiction of the court entitled to our deference under *Chevron*."). Such is the case here. Indeed, even where an agency is responsible for the overall administration of a statute, that does "not empower the Secretary to regulate the scope of the judicial power vested by the statute." *Smith*, 139 S. Ct. at 1778 (internal quotation omitted).

The statutory language here appears in a paragraph titled "Judicial Review" and provides that "[t]here shall be no administrative or judicial review under section 1395ff of this title, 1395oo of this title, or otherwise, with respect to determinations made under this paragraph . . . ." 42 U.S.C. § 1395ww(h)(7)(E). Because this provision addresses the scope of judicial review, the agency's construction of it is not afforded *Chevron* deference.

The Secretary resists this conclusion by trying to distinguish between the provision's preclusion of "administrative" rather than "judicial" review. He argues that because the agency is only interpreting the "administrative review" aspect of the provision, the Court should defer, because doing so "says nothing about the availability of judicial review." ECF. No. 19 at 12. Not so. Whatever a "determination" means for administrative review purposes, the same meaning must attach for purposes of judicial review. Thus, deferring to the Board on its interpretation of this term *necessarily* affects the scope of the Court's power to engage in review. Indeed, faced with the same "no administrative or judicial review" language, the D.C. Circuit held that "*Chevron* does not apply, and we must decide the appropriate construction of the statute de novo." *Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292, 297 (D.C. Cir. 2013).[11] Indeed, that language appears

[11] To be sure, in that case, the specific question before the D.C. Circuit was whether the provision precluded *the Court's* review, while here, the question is whether the provision precludes

in several other provisions of the Medicare statute and none of the courts interpreting those provisions have ever applied *Chevron* deference to the agency's interpretation of them.[12]

The cases the Secretary relies on are not to the contrary. First, the Secretary cites *City of Arlington v. F.C.C.*, for the proposition that *Chevron* applies even to jurisdictional provisions of a statute that the agency administers. *See* ECF No. 19 at 11–12. (citing 569 U.S. 290, 301 (2013)). But that case says nothing about provisions that address judicial review. The issue here is not that the Board's interpretation is jurisdictional, but that it must construe a provision that impacts the scope of judicial review. For a similar reason, the D.C. Circuit's decision in *American Hospital Association. v. Azar* is also irrelevant. 964 F.3d 1230 (D.C. Cir. 2020). There, in deciding whether a statute precluded judicial review, the court had to interpret the phrase "method for controlling unnecessary increase in . . . volume," which appeared in a separate provision relating to the agency's authority. *Id.* at 1238. The Circuit held that when the propriety of judicial review depends on interpreting a separate statutory provision, the court should ignore the judicial review issue and skip directly to the merits by deciding the correct interpretation of the separate statutory provision. *Id.* In that case, because that merits issue involved interpreting a separate provision relating to the agency's authority, the court applied *Chevron* to the agency's interpretation of that provision. *Id.* at 1239. The situation here is different. Unlike in *American Hospital Association*, here, there is no separate merits question requiring the Court to interpret a separate statutory

---

*the Board's* review. But for the reasons explained above, that is a distinction without a difference. Either way, this is not the type of provision for which Congress implicitly delegated gap filling authority to the agency and deferring to the agency would allow it to hold sway over the scope of the Court's jurisdiction.

[12] *See Amgen, Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004) (interpreting 42 U.S.C. § 1395l(t)(12)); *Am. Soc'y of Dermatology v. Shalala*, 962 F. Supp. 141, 146 (D.D.C. 1996) (interpreting 42 U.S.C. § 1395w–4(i)(1)); *Tex. Alliance for Home Care Servs. v. Sebelius*, 811 F. Supp. 2d 76, 91 (D.D.C. 2011) (interpreting 42 U.S.C. § 1395w–3(b)(11)).

provision.

Ultimately, *Chevron* applies only when "Congress has manifested its intent that the agency's interpretation of [a] provision be special . . . and that an agency's interpretation is deserving of the court's deference." *United States v. Harmon*, 514 F. Supp. 3d 47, 57 (D.D.C. 2020) (cleaned up). Congress has not done so here. Thus, the Court will not employ *Chevron* deference.

### B. The Board's Decision was Unlawful Because Loyola's FTE Caps for 2006 and 2007 Are Not Determinations Under Section 422 Precluded from Review

Section 422 provides that "[t]here shall be no administrative or judicial review . . . with respect to determinations made under this paragraph." 42 U.S.C. § 1395ww(h)(7)(E). The Board concluded that Loyola's 2006 and 2007 FTE caps were determinations made under Section 422, and that once calculated, they were not subject to subsequent "revision [] or appeal" but were instead "frozen." ECF No. 22 at 14. The Board was wrong. Loyola's FTE cap is not a Section 422 determination such that it was unreviewable by either the MAC or the Board.[13]

At the outset, the Court briefly re-traces the circuitous connection between Section 422 and a hospital's FTE cap. An FTE cap is an annual calculation made to determine a hospital's DGME payments; it is a calculation the Secretary must make anew for each cost reporting period. 42 U.S.C. § 1395ww(h)(2). A hospital's FTE cap defaults to the weighted average number of full-time equivalent residents reported by the hospital in its most recent cost reporting period before December 1996. *Id.* § 1395ww(h)(4)(F)(i). But the law, and implementing regulations, allow an FTE cap to be modified if a hospital establishes new training programs that were not included in

[13] The parties spar over the Board's conclusion that the MAC properly completed the relevant worksheets in determining Loyola's DGME payment. These worksheets are aids used by MACs to calculate a hospital's DGME payments. Ultimately, though, the parties agree that the worksheets are meant to implement the existing statutory and regulatory framework and that they do not themselves have any substantive significance. *See* ECF No. 14-1 at 48; ECF No. 16-1 at 36, 38. So they carry no weight in the Court's analysis.

that report. *Id.* § 1395ww(h)(4)(H)(i). For most hospitals, this general rule permitting an FTE cap increase for new programs only applies if the new program was established between January 1995 and August 1997. 42 C.F.R. § 413.79(e)(2). But rural hospitals may raise their FTE caps with new programs established after that. *Id.* at 42 C.F.R. § 413.79(e)(3).

Section 422 mandated a one-time redistribution of hospitals' FTE cap slots intended to optimize hospitals' usage of available training slots. To determine whether a hospital would lose FTE cap slots, it required the Secretary to compare a hospital's "reference resident level" to its "otherwise applicable resident limit." 42 U.S.C. § 1395ww(h)(7)(A)(i)(I). Regulations define the "otherwise applicable resident limit" as the hospital's FTE cap, including any increase for new programs that may apply, for the most recent cost report on or before September 2002. If the former was lower than the latter, the hospital's FTE cap was permanently reduced. Then the Secretary redistributed the newly-available cap slots to other hospitals. *Id.* § 1395ww(h)(7)(B).

### 1. The Secretary's Recognition of a Hospital's "Otherwise Applicable Resident Limit" Is Not a Determination Under Section 422 and Is Therefore Not Precluded from Review

The Secretary defends the Board's decision by arguing, essentially, that because a hospital's FTE cap is the same as its "otherwise applicable resident limit," and that limit is a determination under Section 422, the Board's decision was lawful. Putting the first link in that chain aside for the moment, he is wrong about the second. While the Secretary's final, one-time decision under Section 422 to either reduce or raise a hospital's FTE cap is a determination insulated from review, inputs that he considered along the way—such as the "otherwise applicable resident limit"—are not.

In establishing what counts as a determination not subject to review under the statute, the Court begins, as it must, with its text. A "determination" generally refers to the end of a decision-making process. *See* Black's Law Dictionary (11th ed. 2019) (defining "determination" as "[t]he

act of deciding something officially; esp., a final decision by a court or administrative agency"); Oxford English Dictionary, (Mar. 2024), https://www.oed.com/dictionary/determination_n?tab=meaning_and_use#7054930 (defining "determination" as "[a] bringing to an end; a coming to an end; ending; termination"). At the outset, that at least could suggest that only the Secretary's final, one-time decisions under Section 422 to redistribute FTE cap slots are "determinations," although it is hardly definitive. Admittedly, "determination" is a general term that *could* be understood, divorced from any other context, to including anything the Secretary had to calculate along the way. The parties are of little help on this point. Loyola points out that Section 422 uses the word "determine" or "determined" twelve times and suggests that only *those* are the "determinations" exempted from review. ECF No. 17 at 24–25. But that makes little sense. As the Secretary points out, nowhere does the statute use those words to refer to the Secretary's final, one-time decisions, the most natural candidates for exemption from such review. Indeed, Loyola appears to concede that these decisions are unreviewable, and it does not challenge the reduction to its FTE cap that emerged from this process.[14] *Id.* So while the plain meaning of "determination" suggests that the word refers to some final decision made by the Secretary, that and Congress's use of the word throughout Section 422 offer limited guidance about whether it covers a hospital's "otherwise applicable resident limit."

Thus, the Court turns "to other customary statutory interpretation tools." *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 637 (D.C. Cir. 2021) (cleaned up). Highly relevant here is "the strong presumption that Congress intends judicial review of administrative action." *Smith*, 139 S.

---

[14] For his part, the Secretary does not put forward what he believes is the best interpretation of "determination." Instead, he argues that the term is ambiguous, and that therefore, the Court should defer to the Board's interpretation under *Chevron* unless it is unreasonable. ECF No. 16-1 at 25–28. As the Court explained, *Chevron* deference does not apply here, so the Court will not side-step its duty to interpret this provision.

Ct. at 1776 (quotation omitted). Moreover, "[e]ven where, as here, a statutory provision expressly prohibits judicial review, the presumption applies to dictate that such a provision be read narrowly." *Am. Clinical Lab'y Ass'n v. Azar*, 931 F.3d 1195, 1204 (D.C. Cir. 2019) (citation omitted). Indeed, overcoming the presumption requires "clear and convincing evidence that Congress intended" to restrict judicial review of the matter at issue. *Knapp Med. Ctr. v. Burwell*, 192 F. Supp. 3d 129, 133–34 (D.D.C. 2016) (cleaned up). This presumption strongly counsels against interpreting Section 422's judicial preclusion provision broadly, to apply to the many "inputs" that the Secretary had to consider—such as each hospital's "otherwise applicable resident limit"—along the way to making his final one-time decisions to redistribute FTE cap slots.

This reading of the statute also aligns with Section 422's "statutory scheme" and "objectives." *Am. Clinical Lab'y Ass'n*, 931 F.3d. at 1204. After all, there is no reason why these "inputs" would require shielding from judicial review. *See M.M.V. v. Barr,* 456 F. Supp. 3d 193, 211 (D.D.C. 2020), *aff'd sub nom. M.M.V. v. Garland,* 1 F.4th 1100 (D.C. Cir. 2021) ("To the extent the plain text of the provision is in some way ambiguous, the Court is required to look at the term within the structure and context of the statute."). The purpose of the statute was to force a one-time redistribution of hospitals' FTE caps. Thus, so long as the final determinations are unreviewable, it makes no difference whether a hospital can challenge the "inputs" that helped arrive at them.

Finally, as Loyola points out, the Secretary has also understood the statute to operate this way. In responding to proposed Section 422 regulations, some commenters worried about how the Secretary would make his final determination to increase or decrease a hospital's FTE cap if some of the necessary "inputs" for the relevant cost reporting period (the most recent on or before September 2002) were on appeal. *See* FY 2005 Final Rule, 69 Fed. Reg. at 49,117. The Secretary

responded that, in the interest of finality, the agency would use a hospital's unfinalized FTE cap for that cost reporting period, even though he understood that the cap value might change at the end of the appeal process. *Id.* In other words, the Secretary did not view these "inputs" to be unreviewable determinations under Section 422. To the contrary, when considering a situation in which a hospital's "inputs" were on appeal and the agency was forced to use unfinalized values, the Secretary explained that it was only "*the final determination regarding any possible reduction* to the hospital's FTE resident cap [that] is not subject to appeal." *Id.* at 49,118 (emphasis added). Ultimately, the Court agrees with the Secretary's interpretation of the statute, at least then.

For these reasons, the Court holds that the Secretary's calculation of a hospital's "otherwise applicable resident limit" is not a determination under Section 422 that is precluded from review.

**2. Even if the Secretary's Recognition of a Hospital's "Otherwise Applicable Resident Limit" Is a Determination Under Section 422 and Is Therefore Precluded from Review, Loyola's FTE Caps from 2006 and 2007 Are Not Precluded from Review**

Even if the Court were to conclude that Section 422's review provision *does* extend to Section 422's "inputs"—and specifically, to the "otherwise applicable resident limit"—it would *still* not preclude the Board's review of Loyola's FTE caps from 2006 and 2007. That is so because—returning to the first faulty link in the chain of the Secretary's defense of the Board—Loyola's "otherwise applicable resident limit" for purposes of Section 422's one-time redistribution of FTE cap slots is not the same thing as its FTE caps for 2006 and 2007. Simply put, the latter are not Section 422 "determinations made under this paragraph" that are unreviewable. 42 U.S.C. § 1395ww(h)(7)(E). Thus, there is no reason to think that the Secretary's one-time recognition of the former operates to permanently freeze the latter, as the Board held.

To review, an FTE cap is an annual calculation made to determine a hospital's DGME

payments; it is a calculation the Secretary must make anew "for each cost reporting period," 42 U.S.C. § 1395ww(h)(2), and is determined under sub-paragraphs (F)(i) and (H).[15] By contrast, the "otherwise applicable resident limit" only applies to the provisions of Section 422,[16] is a one-time determination, and was used exclusively to determine whether a hospital received a one-time reduction in its FTE cap slots under Section 422. To be sure, the value of a hospital's "otherwise applicable resident limit" is essentially its FTE cap at a particular time; specifically, it is the value of the FTE cap as reported for the reference cost reporting period, which is usually fiscal year 2002.[17] *See* 42 C.F.R. 413.79(c)(3). But that simply means that the "otherwise applicable resident limit" could be described as the FTE cap *for a particular cost reporting year*.

Thus, even if the Board were correct in concluding that Section 422 precludes review of the Secretary's determination of the "otherwise applicable resident limit," at most, that would mean that a hospital's FTE cap for the cost reporting year used to determine the "otherwise applicable resident limit" is unreviewable—not that the hospital's FTE cap for every year going forward is unreviewable. In Loyola's case, the FTE cap reporting period used for its Section 422 calculation was fiscal year ending June 30, 2002. Thus, the only FTE cap value used by the Secretary when he determined Loyola's "otherwise applicable resident limit" was its FTE cap for the 2002 fiscal year cost reporting period. ECF No. 22 at 16. At most, then, its FTE cap for *that year* would

[15] Sub-paragraph (F)(i) sets out the baseline rule that a hospital's FTE cap is the number of residents it trained as reported on its 1996 cost report; sub-paragraph (H) authorizes the Secretary to create rules for adjusting that 1996 cap based on newly created training programs. *See* 42 U.S.C. § 1395ww(h)(4)(H), (F)(i).

[16] Section 422 states in its definition of "otherwise applicable resident limit" that this only applies "[i]n this paragraph." 42 U.S.C. § 1395ww(h)(7)(C).

[17] A hospital may, upon proper application, have that time period include the cost reporting period of July 2003. 42 U.S.C. § 1395ww(h)(7)(A)(ii)(II).

be unreviewable. But Loyola is not challenging that 2002 FTE cap—it seeks to revise its FTE caps for 2006 and 2007. As far as the Court is concerned, there is no plausible way to read Section 422 to mean that Loyola's FTE caps for all later years—including 2006 and 2007—are frozen forever because they were not Section 422 "determinations made under this paragraph" rendering them immune from review. 42 U.S.C. § 1395ww(h)(7)(E).

The Secretary's reading of the statute is further undermined by the fact that it assumes that in passing Section 422's judicial review provision, Congress intended to upend part of the statutory scheme by rendering a dead letter the Secretary's annual obligation to calculate—and potentially adjust—a hospital's FTE cap. The Court is unwilling to make that leap, especially when the case for the Secretary's reading is otherwise so unconvincing. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). Indeed, the Secretary's own regulations make no sense under his reading of the statute. Certain rural hospitals were subject to Section 422, and so the Secretary had to calculate their "otherwise applicable FTE resident cap." But the relevant regulations allow these same rural hospitals to create new training programs and add slots to their FTE caps at any time after their Section 422 determinations, including in 2006 and 2007. *See* 42 C.F.R. § 413.79(e)(3). Under the Secretary's reading of the statute, that would be unlawful. The Secretary points out, accurately, that Loyola is not such a rural hospital. ECF No. 16-1 at 32 n.7. Fine. But the regulations still cannot be squared with the Secretary's position here.

For these reasons, even if the Court were to conclude that the "otherwise applicable resident limit" input is a "determination" under Section 422's judicial review provision, that still would not mean that Loyola's FTE caps for 2006 and 2007 are unreviewable. Because Loyola's FTE caps

for those years were not Section 422 "determinations made under this paragraph," that provision does not render them unreviewable. 42 U.S.C. § 1395ww(h)(7)(E).

## IV. Conclusion

For all these reasons, the Court finds that the Board's decision was unlawful because it was based on a flawed reading of the statute. Thus, the Court will grant Loyola's motion for summary judgment and deny the Secretary's cross-motion for the same, vacate the Board's decision, and remand the matter back to the Board for proceedings consistent with this Memorandum Opinion.[18] A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 31, 2024

[18] Loyola requests that the Court order the Board to award it the additional FTE cap slots it seeks for years 2006 and 2007. And given that the Board's decision to deny Loyola those slots appears to have turned on its conclusion that Loyola's FTE caps for years 2006 and 2007 were unreviewable, the Court sees no obvious reason why Loyola would not be entitled to them. Still, when an agency's decision is unlawful because it is based on flawed reasoning, the ordinary remedy is for a court to vacate the decision and remand to the agency. *See, e.g.*, *Hensley v. United States*, 292 F. Supp. 3d 399, 412–13 (D.D.C. 2018); *Groundfish F. v. Ross*, 375 F. Supp. 3d 72, 92 (D.D.C. 2019). So the Court will do so here.